AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |  |
|---|---|---|
| In the Matter of the Search of | ) | |
| 2050 S Olive Street, Santa Ana, California ("SUBJECT PREMISES"). | ) ) ) ) ) ) ) | Case No. 8:21-MJ-00622 |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

| | |
|---|---|
| 18 U.S.C. § 2252A(a)(5)(B), (b)(1) | Receipt of Child Pornography |
| 18 U.S.C. § 2252A(a)(5)(B), (b)(2) | Possession of Child Pornography |
| 18 U.S.C. § 2251(a) | Production of Child Pornography |
| 18 U.S.C. § 2422(b) | Online Enticement of a Minor |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of ___ days *(give exact ending date if more than 30 days:*_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI Special Agent Orcina Pacheco-Garcia Ford (916) 539-4254
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: Santa Ana, CA_____

_____
*Printed name and title*

**AFFIDAVIT**

I, Orcina A. Pacheco-Garcia, Special Agent of the Federal Bureau of Investigation ("FBI"), being duly sworn, declare and state as follows:

## I. INTRODUCTION

1.   I am a Special Agent with the Federal Bureau of Investigation and have been since March 2019. I have worked for the Federal Bureau of Investigation in other capacities since September 2017. I am currently assigned to the Sacramento Division. While employed by the FBI, I have investigated federal criminal violations related to, among other things, the exploitation of children and human trafficking. I have gained experience through training at the FBI Academy as well as by conducting these types of investigations. As part of my daily duties, I investigate criminal violations relating to child exploitation and child pornography, including, but not limited to, violations pertaining to the illegal production, distribution, receipt, possession of, and access with intent to view, child pornography, in violation of 18 U.S.C. §§ 2251, 2252, and 2252A. In the course of my employment, I have observed and reviewed numerous examples of child pornography in all forms of media, including computer media. Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§

2251, 2252, and 2252A, and I am authorized by the Attorney General to request a search warrant.

## II. <u>PURPOSE OF AFFIDAVIT</u>

2.    This affidavit is made in support of an application for a warrant to search 2050 S Olive Street, Santa Ana, California (hereinafter referred to as the "SUBJECT PREMISES"), as further described in Attachment A, for violations of 18 U.S.C. §§ 2252A(a)(2) and (a)(5)(B) (receipt and possession of child pornography), 18 U.S.C. §§ 2251(a) (production of child pornography), and 18 U.S.C. §§ 2422(b) (online enticement of a minor) (the "Subject Offenses").

3.    As described further in Attachment B, the requested warrant seeks authorization to seize evidence, fruits, and instrumentalities, for violations of the Subject Offenses. Attachments A and B are attached hereto and incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III.  BACKGROUND ON CHILD EXPLOITATION OFFENSES, COMPUTERS, THE INTERNET, AND DEFINITION OF TERMS

5.    In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.  The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

6.    Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers with child pornography:

a. <u>Computers and Child Pornography</u>.  Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

b. <u>File Storage</u>.  Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media

device, etc. (i.e., "locally") or on virtual servers
accessible from any digital device with an Internet
connection (i.e., "cloud storage").  Computer users
frequently transfer files from one location to
another, such as from a phone to a computer or from
cloud storage to an external hard drive.  Computer
users also often create "backup," or duplicate,
copies of their files.  In this way, digital child
pornography is extremely mobile and such digital
files are easily reproduced and transported.  For
example, with the click of a button, images and
videos containing child pornography can be put onto
external hard drives small enough to fit onto a
keychain.  Just as easily, these files can be copied
onto compact disks and/or stored on mobile digital
devices, such as smart phones and tablets.
Furthermore, even if the actual child pornography
files are stored on a "cloud," files stored in this
manner can only be accessed via a digital device.
Therefore, viewing this child pornography would
require a computer, smartphone, tablet, or some
other digital device that allows the user to access
and view files on the Internet.

c. Internet.  The term "Internet" is defined as the
worldwide network of computers -- a noncommercial,
self-governing network devoted mostly to
communication and research with roughly 500 million

4

users worldwide.  The Internet is not an online
service and has no real central hub.  It is a
collection of tens of thousands of computer
networks, online services, and single user
components.  In order to access the Internet, an
individual computer user must use an access
provider, such as a university, employer, or
commercial Internet Service Provider ("ISP"), which
operates a host computer with direct access to the
Internet.

d. <u>Internet Service Providers</u>.  Individuals and
businesses obtain access to the Internet through
ISPs.  ISPs provide their customers with access to
the Internet using telephone or other
telecommunications lines; provide Internet e-mail
accounts that allow users to communicate with other
Internet users by sending and receiving electronic
messages through the ISPs' servers; remotely store
electronic files on their customer's behalf; and may
provide other services unique to each particular
ISP.  ISPs maintain records pertaining to the
individuals or businesses that have subscriber
accounts with them.  Those records often include
identifying and billing information, account access
information in the form of log files, e-mail
transaction information, posting information,
account application information, and other

information both in computer data and written record
format.

e. <u>IP Addresses</u>.  An Internet Protocol address ("IP
Address") is a unique numeric address used to
connect to the Internet.  An IPv4 IP Address is a
series of four numbers, each in the range 0-255,
separated by periods (e.g., 121.56.97.178).  In
simple terms, one computer in a home may connect
directly to the Internet with an IP Address assigned
by an ISP.  What is now more typical is that one
home may connect to the Internet using multiple
digital devices simultaneously, including laptops,
tablets, smart phones, smart televisions, and gaming
systems, by way of example.  Because the home
subscriber typically only has one Internet
connection and is only assigned one IP Address at a
time by their ISP, multiple devices in a home are
connected to the Internet via a router or hub.
Internet activity from every device attached to the
router or hub is utilizing the same external IP
Address assigned by the ISP.  The router or hub
"routes" Internet traffic so that it reaches the
proper device.  Most ISPs control a range of IP
Addresses.  The IP Address for a user may be
relatively static, meaning it is assigned to the
same subscriber for long periods of time, or
dynamic, meaning that the IP Address is only

assigned for the duration of that online session. Most ISPs maintain records of which subscriber was assigned which IP Address during an online session.

f. IP Address – IPv6.  Due to the limited number of available IPv4 IP addresses, a new protocol was established using the hexadecimal system to increase the number of unique IP addresses.  An IPv6 consists of eight sets of combination of four numbers 0-9 and/or letters A through F.  An example of an IPv6 IP address is 2001:0db8:0000:0000:0000:ff00:0042:8329.

7.  The following additional definitions apply herein:

a. "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b. "Chat room," as used herein, refers to the ability of individuals to meet in one location on the Internet in order to communicate electronically in real-time to other individuals. Individuals may also have the ability to transmit links to electronic files to other individuals within the chat room.

c. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

d. "Cloud-based storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet. Users of such a service can share links and associated passwords to their stored files with other traders of child pornography in order to grant access to their collections. Such services allow individuals to easily access these files through a wide variety of electronic devices such as desktop and laptop computers, mobile phones, and tablets, anywhere and at any time. An individual with the password to a file stored on a cloud-based service does not need to be a user of the service to access the file. Access is typically free and readily available to anyone who has an Internet connection.

e. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar

computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

f. "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-

9

numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

h. "Encryption" is the process of converting data into a code in order to prevent unauthorized access to the data.

i. "Log files" are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

10

j. "Records," "documents," and "materials," as used
herein, include all information recorded in any
form, visual or aural, and by any means, whether in
handmade, photographic, mechanical, electrical,
electronic, or magnetic form.

k. A "storage medium" or "storage device" is any
physical object upon which computer data can be
recorded. Examples include hard disks, RAM, floppy
disks, "thumb," "jump," or "flash" drives, CD-ROMs,
and other magnetic or optical media.

l. A "Website" consists of textual pages of information
and associated graphic images. The textual
information is stored in a specific format known as
Hyper-Text Mark-up Language (HTML) and is
transmitted from web servers to various web clients
via Hyper-Text Transport Protocol (HTTP).

## IV. <u>SUMMARY OF PROBABLE CAUSE</u>

8.   The requested search warrant is in furtherance of an
investigation into a user by the name upbackred223@gmail.com,
later identified as Marcos Lucero, (hereinafter referred to as
SUBJECT ACCOUNT), who has received, possessed, and caused the
manufacture of child pornography, as well as enticed a minor,
with online username jasminemegle@gmail.com, whose account was
taken over by an FBI Online Covert Employee (OCE).  As set forth
below, there is evidence associating the SUBJECT ACCOUNT with
the SUBJECT PREMISES in the Central District of California.

## V. <u>STATEMENT OF PROBABLE CAUSE</u>

9.   On or about August 13, 2021, VICTIM who resides within the Eastern District of California, met SUBJECT ACCOUNT online through the application Zepeto. Users can interact with others in chatrooms and games within the application. SUBJECT ACCOUNT and VICTIM ACCOUNT exchanged Gmail email addresses to communicate outside of Zepeto. SUBJECT ACCOUNT will be referred to as SA and VICTIM ACCOUNT as VA in the below Gmail email dialogue and hereinafter:

…

SA: How big is your tits

*VA: B cup//Is that ok*

SA: Mmm i will loe to suck n bit n slap your tits

*VA: Mmm I'm getting horny*

…

*VA: Can you show me your dick//Pleaseeeee*

SA: I am play with my dick thinking about u

*VA: Cute love can I call you daddy*

SA: [sent penis photo][1]//Sent me a pic//Yes u can call me daddy6

*VA: Of what tit pussy//What you want daddy*

---

[1] The photo SUBJECT ACCOUNT sent was of an erect penis as the focus of the image. The image appears as if the SUBJECT is laying on his bed, shorts around his ankles, exposing his legs, shaft of the penis, and pubic hair. In the background, you can see a drawer with items on top and a cubby storage area.

SA: Both//Tits n pussy//What are u doing baby

*VA: [sent three photos][2]//I'm alone in my room not in the whole house tho*

29.   From on or about August 13, 2021 to August 19, 2021, SUBJECT ACCOUNT and VICTIM ACCOUNT engaged in multiple sexual conversations and exchanged photos.  The first image depicts the body of a female from the neck down.  The female is wearing a gray bra and has her black pants partially pulled down showing her hip.  The second picture depicts the same female in a seated position.  Her fingers are exposing the inside of her vagina. No face is depicted in the image only her gray bra, stomach and thighs.  The third image depicts the same female with her vagina and breast exposed in a seated position.  The victim was 11 years old at the time the images were taken and sent to SUBJECT ACCOUNT. The Gmail emails/chats are labeled with the display name "Macros Lucero," Gmail account "upbackred223@gmail.com," and VICTIM ACCOUNT.

30.   On September 3, 2021, law enforcement checks were completed on upbackred223@gmail.com.  From February 2, 2020 through March 3, 2020, JP Morgan Chase reported various

---

[2] The first image depicts the body of a female from the neck down.  The female is wearing a gray bra and has her black pants partially pulled down showing her hip. The second picture depicts the same female in a seated position.  Her fingers are exposing the inside of her vagina with pubic hair.  The third image depicts the same female with her vagina and breast exposed in a seated position. No face can be seen in the above three pictures.  Also in view of the photo are her inner thighs, stomach, and gray bra.

counterfeit checks and identity theft activity listing MARCOS
LUCERO as a suspect. The emails utilized for those financial
transactions were marcoslucero633@yahoo.com and
Upbackred233@gmail.com.  The individual utilizing the
upbackred223 username was identified as MARCOS LUCERO, date of
birth 04/13/1991. According to Santa Police Department, on July
14, 2021, LUCERO was booked on a domestic violence complaint;
reports and booking information listed LUCERO's address as 2050
S Olive St, Santa Ana, CA. The domestic violence charges were
not adjudicated.

31.  According to the California Department of Motor
Vehicles, LUCERO's registered vehicle is a 2017 Toyota, license
plate 7WDD928 with the registered physical address of 2050 S
Olive St, Santa Ana, CA.  On September 13, 2021, surveillance
checks conducted at 2205 S Olive St, Santa Ana, CA witnessed
LUCERO's registered vehicle parked outside of the residence. In
addition, Accurint law enforcement database checks identify
upback@yahoo.com as an additional email address for LUCERO and
list 2050 S Olive St, Santa Ana, CA as his current address.

32.  According to a Hanover County Sheriff's Office report
in May 2019, LUCERO was identified as possibly possessing child
pornography from an additional minor victim located in the state
of Virginia.  The complaint information was sent to Santa Ana
Police Department for further investigation.  No further
investigation was conducted on LUCERO concerning the complaint
information.

14

A.    **FBI ASSUMES ONLINE IDENTITY**

33.    On August 26, 2021, an FBI Online Covert Employee
(OCE), responded to Gmail emails from LUCERO to VICTIM ACCOUNT.
On August 30, 2021, the OCE disclosed his/her phone number to
the subject.  After the OCE disclosed his/her number to the
subject, the subject began sending text message to the OCE from
a phone number ending in 8141. Based on the texts, it appeared
that the VA told the SUBJECT her age earlier, and the SUBJECT
knew her true age. The OCE was aware that the victim had
disclosed a minor age but was uncertain as to whether the VA had
communicated she was 13 or 11 year old.  The below is a
summarized dialogue:

> SA: Happy Birthday//U tell me once u was 11
>
> *OCE: Yea ur right* 🙁 *I just don't like people knowing I'm
> that young//But I can trust u right?*
>
> SA: Idc baby//U still my babygirl
>
> …
>
> SA: How old are you really
>
> *OCE: 11 no lie [handshake emoji] promos [sic]*
>
> …
>
> *OCE: R u really 30? I like that ur older ;)*
>
> SA: Yee//Where are u from
>
> *OCE: Vacaville and Sacramento// My parents divorced so I
> go back and forth*

15

SA: One for this i promise i will seeu [sic]//One for this day i will see u

*OCE:  In person [excited emojis and hug emoji]?!?!*

SA: Yes

*OCE: Omg I can't wait for that day…*

SA: I may go for a vacation

*OCE: It would have to be when I'm with my mom. She doesn't care what I do…*

SA: Okay Baby//Can u spent [sic] the night

…

*OCE: Yes! She leaves me alone all the time//…she's too busy with her boyfriends to care*

SA:  Can we be in your room//Or i get a room just for us

*OCE: Yes I go stay friends all the time. Sometimes she'll leave and sleep at her boyfriends…I get left all alone*

SA: lol will they get mad if your friend u in a room with a older guy

*OCE: …she doesn't care. I don't tell them my business*

SA: Will u let me cum inside your Pussy//I can buy plan b

*OCE: Yes it wud be first time so I would want to know the feeling//I won't get sick from taking plan b right?*

SA: U will not get sick//It will kill my sperm for u to not get pregnant

*OCE: That's perfect…yummy*

10.   The conversation continued, with LUCERO asking if the OCE would be on her period and if the OCE's minor friends could watch them having sex. LUCERO wanted to know if the OCE has ever been to Orange County and if she would be visiting soon so they could meet.

11.   On September 1, 2021, the OCE received various text messages from LUCERO to include the image of an erect male penis.  The following are summarized text messages after LUCERO sent the penis image.

*OCE: Will it hurt a little? When U first put it inside me?*

SA: Idk maybe. But I will need to Get u wet n horny

…

SA: What are you doing baby

*OCE: Super wet… it doesn't take much get wet*

SA: Mmmm

*OCE: In class hehe it stupid Home Ed class*

…

*OCE: Wat kind of things will u do to me before sex?*

SA: Kiss u n suck n bit your lip neck//take off your clothes

…

OCE: Have u had sex with a virgin before?

SA: No

*OCE: So I'd be ur first [Heart Eye Emoji]?!*

17

SA: U will be my first//Honest my dream to have 2 girl to suck my dick fast time//Yes baby

34.  LUCERO then sent a ten-second video of a male ejaculating an erect penis. LUCERO discussed plans on seeing OCE during the weekday.  He said they would need to find a place. LUCERO asked the OCE what they would tell people if they saw them together.  LUCERO then stated they would tell people that he was her dad and he adopted her if they did not look similar. He said he would first need to get money.  Followed by the following messages:

SA: Will u let me cum inside your Pussy or no

*OCE: Yes baby i told u I wud//I promise// Just make sure u have the thing u said*

SA: Buy a plan b

35.  On September 3, 2021, the following text messages were exchanged:

SA: I will need to make money for the gas n the room n good

*OCE: But u have to be gentle the first time we sex k? Promise?*

SA: Food//Yes baby/ I promise

*OCE: How long before u come see me* ☹*????*

SA: When i get the money i promise i will go// I am sorry

OCE: K

SA: Are you mad at me

*OCE: No baby I just cant wait!!!!*

SA: Sorry it is a long drive//I will need a lot for gas to go n come back n food n i may get the room for 2 day// I can make it I have drive to las Vegas and to Nevada same day

12.   On September 6, 2021, LUCERO requested a picture of the OCE.  When asked what type of picture he wanted, LUCERO said "surprise me".  The OCE then sent a picture of the front of his/her shirt and the bottom of his/her face mask. Only a small portion of his/her neck and arm skin could be seen.  No face was shown in the image. The following summarized message proceeded:

SA: If you do it do you want it with a condom or without

*OCE: Idk baby wat do u think?? How will it feel with a condom?*

SA: Like plastic//Cuz I do not know if you are allergic to latex

…

SA: Where do u want me to cum at

*OCE: Hmm how bout a napkin*

SA: Okay baby//I will buy plan b if that happen

*OCE: Yumm yes daddy*

SA: Buy plan b if i cum inside your Pussy

*OCE: Yes baby I cant wait//I want u inside me*

SA: Plus I don't know if you are allergic to latex and I

really do not want to try

…

SA: Sorry it is a question u can said no will u let me fuck u on the ass

OCE: *Hmmm idk wont that hurt me?*

SA: Yes it is your first time//like me fuck u// it will hurt u

13.   In later chats on September 6, 2021, LUCERO stated he had two ex-girlfriends who were 21 and 15-years-old. He stated he did not have sex with the 15-year-old girlfriend. LUCERO stated he has had sex with twenty or more girls. He said one of the girls he had sex with was fifteen years old but she was not his girlfriend; LUCERO stated "I cum inside her Pussy".

14.   On September 7, 2021, LUCERO asked OCE if she had money to pay for a room and if she could find a motel by her mom's house. OCE sent him a Google search of a Motel 6 located in Sacramento, CA. The following texts proceeded:

SA: How close is that to u

*OCE: Really close. I can walk to there [Girl Emoji]*

…

SA: lol u will eat my baby

*OCE: ?*

SA: My cum//Do u get it

*OCE: [Girl emoji shrugging] idk how does it taste?*

SA: Idk//I can be your first on everything

…

SA: Part for me want to go rn

…

*OCE: I know I wanna see you*

SA: I need to save more money//I was close to use your pic to scam people

*OCE: Why wud u do that???//The one I just u?!*

SA: No the other//One[3]//I was not going to do it i promise

*OCE: But how wud u scam people?*

SA: I was thinking about it//Your age

*OCE: Wat wud u try and get from them?*

SA: Money

*OCE: So u still have my pics baby [Smile Shy Emoji]//I thought u prob deleted them by now*

SA: Yes baby why//Nooo

*OCE: Idk I just thought I was another girl*

SA: Nooo baby

*OCE: I luv u [Kissing Emoji]*

---

[3]In the prior Gmail conversations between LUCERO and Victim Account, the victim emailed three child sexual adolescent material to LUCERO.  The victim stated these were the only three pictures sent to LUCERO.

SA: U know they are alot for guy that will pay alot for money//I love u too [Heart Emoji]

OCE: *I know. But u wud hurt me if u did that// [Sad Crying Emoji]//Those were only for u*

SA: They are my pic

OCE: *Are u lying? Have u sold them?*

SA: Nooo//I promise//I have not

OCE: *Ok…I believe u*

SA: Lol if i did i will buy u a gift card

OCE: *No money wud satisfy me//No money is worth the trust I've given u*

SA: True that//First i will ask u if I can

…

OCE: *I also check my cash savings and I have $365 to help :) that shud be enough for gas and stuff right?// I just don't have a credit card*

SA: Damm that a lot for money//Yes

15.   On September 8, 2021, the Victim was telephonically interviewed by Special Agents regarding her interaction with LUCERO. Victim stated he/she produced the images shared with upbackred223@gmail.com on August 13, 2021, specifically at LUCERO's request. The photos were taken, shared and deleted from Victim's device. These were the only files she sent to LUCERO.

16.   On September 8, 2021, the OCE received a text from

22

LUCERO in which he stated "what happen if i said yes but i use all your money." OCE agreed with LUCERO taking the money and said she does not use the cash.   On September 8, 2021, the OCE placed an undercover voice call to LUCERO. OCE asked LUCERO when he would be traveling to see her. LUCERO responded he was planning on traveling Wednesday, September 15, 2021, but would confirm early next week.

17.  On September 9, 2021, the following text messages were exchanged:

SA: Can i ask u something dirty

*OCE: Ask me anything baby ;)*

SA: Sorry i am fuck horny//I will love to video chat with u

*OCE: Yea nah…//Sorry baby :(*

SA: It is love// It is ok my love//Sorry can I take pic for u n video for u when we together//If we are make love

*OCE: ? huh*

SA: When we have sex can I video it

*OCE: Do want to?*

SA: It will be hot if u are ok with it

*OCE: Why do want to film it baby?*

SA: I can watch it over n over n over//Remember how tight your Pussy

*OCE: R u gonna share it?*

SA: Fuck nooo//My eyes only

*OCE: How wud u film it?*

SA: My phone

…

SA: Will u sent the night when i get there and will u sent
the day n night with me

18.   On September 10, 2021, the following text messages
were exchanged:

SA: How are u baby

*OCE: Agh I'm so annoyed with my 6th grade classes are so
hard [Sad Emoji]*

SA: Which one//I can help anyway

*OCE: Ur so sweet baby [Heart and Kissing Emoji]*

SA: It been a long time I did 6 grade I can try to help u

…

*OCE: R u still coming to see me? I told my dad I am gonna
be at my moms next week*

SA: If I don't get it you will see me next week

*OCE: So excited [Excited Emoji] and a lil nervous [Smiling
Emoji]*

SA: Me too// It'll be a nice drive

19.   In later chats on September 10, 2021, LUCERO stated he
was in the shower and sent the OCE a video depicting the face

and body of a male ejaculating inside the shower.  LUCERO pro-
ceeded to send an image of his penis inside the shower and re-
quested a picture from the OCE.  The OCE asked LUCERO what type
of picture he wanted.  LUCERO stated, "Your face n your body n
your tits n your ass n your pussy n your voice".

20.  On September 12, 2021, the following text messages
were exchanged:

*OCE: Babe are you sure you wanna see me? If your not*
*ready…no biggie… just tell me*

SA: Yes and no// Yes cuz I want to do something for me//And
no I don't want to get in trouble and i don't want to force
u//I don't know if u are really going to come//and how will
u come inside the room//And what happen of they stop u n
ask u where are u going// Yes I really do want to see
u//Are u ready

*OCE: I walk there all the time to go to Scandia park with*
*my friends// Yes I've been ready for u baby*

…

SA: K love//Should i leave the keys somewhere// Honest when
i get there i will be sleeping//for u to open the door to
come in//Now i am thing where should i leave the keys

*OCE: Idk [ Shrugging Emoji] windshield of u car?*

SA: True or top for my Tire//Can u get for the house any-
time u want//Get out from the house anytime u want

*OCE: Yea babe I told my mom is chill*

SA: I sleep nake// What will u do if u see me nake in the bed

*OCE: I can also go to my cousins in Fresno. But I cant sneak u in their house.// Up to u babe//But I don't wanna go to Fresno if u are not ready.*

SA: But can u stay the night

*OCE: Fresno is boring…*

SA: Can u spent 2 night with me

*OCE: I've stayed at my friends Lizzies house before*

SA: If u go to Fresno//thinking of u anyway you can get close to here

*OCE: I'll just let her know im gonna go see my friend//That's as close as I can get//Sorry [Shrugging Emoji]*

SA: I know// It is 3 hours drive

*OCE: I wish I was old enough to drive. [Sad Face Emoji]//Can't wait till I can!*

SA: Sorry I was think how will drive 6 hours//Can u find a motel close to your cuz or your friend house//Where will u go//plz

*OCE: K*

21.   On September 12, 2021, OCE then sent LUCERO a Google link to a Motel 6 at 445 N Parkway, Fresno, CA 93706. LUCERO

called the OCE on a recorded voice call.  During the conversa-
tion they discussed meeting and how they were both excited to
see each other. OCE told LUCERO she had online classes and would
not be able to meet until after 2:00 pm. LUCERO said he would be
leaving work and then driving to the hotel.  He said he would be
asleep but the OCE could walk into the room.  LUCERO said he
would be naked and asked the OCE what she would do when she saw
him naked.  The OCE stated she would let him sleep and or touch
him.  The following text messages were sent after the voice
call:

> SA: So $212//Not bad//The $1202 is for the rooms for two
> nights with the security deposit//212 dollars//$212 with a
> security deposit and the two nights//not bad

22.  Also on September 12, 2021, the OCE received confirma-
tion from the SUBJECT stating that he would travel on Wednesday,
(September 15, 2021), his day off, and he would be meeting the
OCE at the motel. SUBJECT said he would be arriving between 9AM
and 12PM. SUBJECT stated that he would be leaving the motel key
somewhere near his car, either underneath the tire, or on the
windshield.

## VI. TRAINING AND EXPERIENCE ON INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

23.   Based on my training and experience, and the training and experience of other law enforcement officers, including those who regularly prosecute child exploitation cases, with whom I have had discussions, I have learned that individuals who distribute, receive, view, and possess images of child pornography are often individuals who have a sexual interest in children and in images of children.  Given the facts described above, I believe MARCOS LUCERO living in the SUBJECT PREMISES has an interest in child pornography and a sexual interest in minors.  I know from my training and experience that there are certain characteristics common to individuals with these interests:

>    a. Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media, or from literature describing such activity.

>    b. Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children

28

oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Individuals who have a sexual interest in children or images of children almost always possess and maintain their "hard copies" of child pornographic material if they have it, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and/or videotapes for many years.

d. Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's

residence or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly.

e. Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

f. Child pornography received via computer is extremely mobile.  Through computer technology, digital files are easily reproduced and transported.  For example, with the click of a button, images and videos containing child pornography can be put onto thumb drives so small that they fit onto a keychain.  Just as easily, these files can be copied onto disks, or

stored on cellular telephones and other digital devices.

g. Because the Tor browser may be used on both computers and mobile devices, I believe that the user at SUBJECT PREMISES has used a digital device to access at least some portion of his child pornography collection.  As such, it is likely that there will be further evidence of his child pornography-related activities on any digital device recovered from his home or his person. Digital child pornography on a digital device is easy to maintain for long periods of time.  Modern digital devices often have extremely large storage capacities. Furthermore, cheap and readily available storage devices, such as thumb drives, external hard drives, and compact discs make it simple for individuals with a sexual interest in children to download child pornography from the Internet and save it – simply and securely – so it can be accessed or viewed indefinitely.

h. Because of the nature of computer data, as described in more detail below, persons who collect and store child pornography likely have that child pornography, or remnants of it, on their digital devices for extended periods of time.  For example, even without the user's knowledge, computers can often keep track of websites visited or data that

has been downloaded, and store it in temporary "caches" or other files.  As a result, even if the user of the SUBJECT ACCOUNT used a digital device or another digital device located elsewhere to access the Internet and child pornography, it is likely that evidence of this access will be found in the SUBJECT PREMISES.

i. Furthermore, even if a person deleted any images of child pornography that may have been possessed or distributed, there is still probable cause to believe that there will be evidence of the illegal activities – that is, the possession, receipt, and/or distribution of child pornography – at the SUBJECT PREMISES or on his person.  Based on my training and experience, as well as my conversations with digital forensic experts, I know that remnants of such files can be recovered months or years after they have been deleted from a computer device. Evidence that child pornography files were downloaded and viewed can also be recovered, even after the files themselves have been deleted, using forensic tools.  Because remnants of the possession, distribution, and viewing of child pornography is recoverable after long periods of time, searching the SUBJECT PREMISES could lead to evidence of the child exploitation offenses.

j. There is probable cause to believe that someone at
the SUBJECT PREMISES uploaded, viewed, and shared
child pornography.  It is likely that the person who
did so lives at the SUBJECT PREMISES.  As such, it
is likely that likely that digital devices within
the SUBJECT PREMISES will contain evidence of the
SUBJECT OFFENSES.

## VIII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

24.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a. A person who connects to the Internet must use a
computer or mobile device, such as a tablet or
wireless telephone, to facilitate that access.
Furthermore, in my training and experience, these
devices typically travel with a subject or remain in
SUBJECT PREMISES.  It is therefore reasonable to
believe that computers, tablets, wireless
telephones, and other electronic storage media may

---

[4] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

be present in SUBJECT PREMISES.  Further, because it is possible to store certain mobile devices, such as removable storage media and wireless telephones, in a pocket, it is reasonable to believe that mobile devices may be found on the persons.

b. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

c. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user

34

stores files, and in places where the user may be
unaware of them.  For example, recoverable data can
include evidence of deleted or edited files;
recently used tasks and processes; online nicknames
and passwords in the form of configuration data
stored by browser, e-mail, and chat programs;
attachment of other devices; times the device was in
use; and file creation dates and sequence.

d. The absence of data on a digital device may be
evidence of how the device was used, what it was
used for, and who used it.  For example, showing the
absence of certain software on a device may be
necessary to rebut a claim that the device was being
controlled remotely by such software.

e. Digital device users can also attempt to conceal
data by using encryption, steganography, or by using
misleading filenames and extensions.  Digital
devices may also contain "booby traps" that destroy
or alter data if certain procedures are not
scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption,
even for devices or data that cannot currently be
decrypted.

f. Based on my training, experience, and information
from those involved in the forensic examination of
digital devices, I know that it is not always
possible to search devices for data during a search

of the premises for a number of reasons, including the following:

g. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

h. Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

25.  The search warrant requests authorization to use the biometric unlock features of the devices seized, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a

36

fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. As noted above, I know that most homes with Internet capability use only one IP address. That IP address, in turn, is often shared by many devices that access the Internet using a wireless modem. Accordingly, if there are multiple digital devices discovered during a search of the SUBJECT PREMISES,

37

any of those devices could have been used to access the Internet and download the files discussed above.

d. Thus, if while executing the warrant, law enforcement personnel encounter a digital device within the scope of the warrant that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to MARK OSTER, who is located at the SUBJECT PREMISES during the execution of the search: (1) depress the person's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

26. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. CONCLUSION

27. For all the reasons described above, there is probable cause to believe to believe that evidence, fruits, and instrumentalities of violations of the Subject Offenses, as described in Attachment B will be found in a search of the SUBJECT PREMISES.

_____
ORCINA A. PACHECO-GARCIA
Special Agent
Federal Bureau of
Investigation


Attested to by the applicant in
accordance with the requirements
of Federal Rule of Criminal
Procedure 4.1 by telephone on this
___ day of September 2021.


_____
HONORABLE JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

PREMISES TO BE SEARCHED

    The premises is located at 2050 S Olive St, Santa Ana, CA. The house is a 3 bedroom, 2 baths, 1,252 square foot single level home.  The front of the house has a dark colored door with a black screen/security door and yellow exterior with lighter trim, with a brick chimney on the south end of the house.  The numbers "2050" appears on the curb between the sidewalk and the street, as well as the southeast corner of the house.



**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities for violations of 18 U.S.C. §§ 2252A(a)(2) and (a)(5)(B) (receipt and possession of child pornography), 18 U.S.C. §§ 2251(a) (production of child pornography), and 18 U.S.C. §§ 2422(b) (online enticement of a minor) (the "Subject Offenses"), namely:

a.   Child pornography, as defined in 18 U.S.C. § 2256(8).

b.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), such as documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c.   Any records relating to hotel receipts and or room reservations.

d.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256.

e.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that evidence any production, receipt, shipment, order, request, trade, purchase, or transaction of any kind involving the transmission through interstate commerce by any means, including by computer, of any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

f.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, identifying persons transmitting in interstate commerce, including by computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

g.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

h.    Any and all records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

i.    Any records, documents, programs, applications, or materials identifying possible minor victims depicted in child pornography and/or minor victims of sexual abuse.

j.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to peer-to-peer file sharing software.

k.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to accounts with any Internet Service Provider.

l.    Records, documents, programs, applications, materials, and files relating to the deletion, uploading, and/or acquisition of victim files to include photographs, videos, e-mails, chat logs, or other files.

m.    Any digital device used to facilitate the above-listed violations and forensic copies thereof.

n.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

o.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

**SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall

complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.    The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

iv.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items

vii

to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

c.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

d.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data and may access such data at any time.

e.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

f.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

g.    After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offenses listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

6.   During the execution of this search warrant, with respect to MARCOS LUCERO, who may be present at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant, law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of the person onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.